UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Robert Dingle Jr.

_____

NAME OF PLAINTIFF(S)

v.

Bimbo Bakeries USA/Entenman's

_____

NAME OF DEFENDANT(S)

☐ ORIGINAL

AMENDED
COMPLAINT
11-CV-2879 (CBA)(VP)
(JURY TRIAL DEMANDED)

This action is brought for discrimination in employment pursuant to (check only those that apply):

✓      Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) (race, color, gender, religion, national origin).
**NOTE:** *In order to bring a suit in federal district court under Title VII, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.*

_____ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 - 634 (amended in 1984, 1990, and by the Age Discrimination in Employment Amendments of 1986, Pub. L. No. 92-592, the Civil Rights Act of 1991, Pub. L. No. 102-166).
**NOTE:** *In order to bring a suit in federal district court under the Age Discrimination in Employment Act, you must first file charges with the Equal Employment Opportunity Commission.*



_____ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 - 12117 (amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325 and the Civil Rights Act of 1991, Pub. L. No. 102-166).
**NOTE:** *In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.*

Jurisdiction is specifically conferred upon this United States District Court by the aforementioned statutes, as well as 28 U.S.C. §§ 1331, 1343. Jurisdiction may also be appropriate under 42 U.S.C. §§ 1981, 1983 and 1985(3), as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, and any related claims under New York law.

1. Plaintiff resides at:

   115-55 219 ST. CAMBRIA HGTS.
   Street Address

   H: (718)276-3894

   QUEENS, NY, 11411, (516)672-5174
   County    State   Zip Code   Telephone Number

2. Defendant(s) resides at, or its business is located at:

   1500 TROY AVE
   Street Address

   Kings County, BKLYN, NY, 11203
   County   City   State   Zip Code

3. The address at which I sought employment or was employed by the defendant(s) is:

   1500 TROY AVE.
   Street Address

   Kings, BKLYN, NY, 11207
   County   City   State   Zip Code

4. The discriminatory conduct of which I complain in this action includes *(check only those that apply).*

|   |   |
|---|---|
| ____ | Failure to hire. |
| ✓ | Termination of my employment. SUSPENSION |
| ____ | Failure to promote. |
| ____ | Failure to accommodate my disability. |
| ✓ | Unequal terms and conditions of my employment. |
| ✓ | Retaliation |
| ✓ | Other acts *(specify)*: _____ |

**NOTE:** *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.*

5. It is my best recollection that the alleged discriminatory acts occurred on:
   __MARCH 2010_____ .
   Date(s)

6. I believe that the defendant(s) *(check one)*

   ✓ is still committing these acts against me.

   ____ is not still committing these acts against me.

7. Defendant(s) discriminated against me based on my:
   *(check only those that apply and state the basis for discrimination, for example, what is your religion, if religious discrimination is alleged)*

   [ ] race _____     [ ] color _____

   [✓] gender/sex __MALE__       [ ] religion _____

   [ ] national origin _____

   [ ] disability _____

   [ ] age. If age is checked, answer the following:

   I was born in _____. At the time(s) defendant(s) discriminated against me,
                  Year
   I was [ ] more   [ ] less than 40 years old.  *(check one).*

**NOTE:**   *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.*

8. The facts of my case are as follows:

PLEASE SEE ATTACHED.

*(Attach additional sheets as necessary)*

**NOTE:**   *As additional support for your claim, you may attach to this complaint a copy of the charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights, or the New York City Commission on Human Rights.*

9. It is my best recollection that I filed a charge with the New York State Division of Human Rights or the New York City Commission on Human Rights regarding defendant's alleged discriminatory conduct on: _____.
                                                                                  Date

10. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct on: 11/17/10.
                                                                                   Date

<u>I Plaintiff have been the victim of sexual harassment, and discrimination in violation of Article 7 of the Civil Rights Act of 1964 and company policy and his rights to equal protection of the law and his due process rights protected by the United States Constitution because the company failed to adhere to its own policy.</u>

In order for the court to understand the case it is incumbent upon me to explain, in brief, the makeup of the company. <u>Plaintiff was sexually harassed by Brian Lim-Tom, Leon A.</u> Broderick and Donald Matthews. Although Matthews only participated once, Brian Lim-Tom is the morning Supervisor/Forman of the loading platform (a position referred to by the company as rack loader Forman and those who work under his supervision are called rack loaders. Leon A. Broderick is the evening rack loader Forman and also serves as Assistant Forman to Brian Lim-Tom.

Plaintiff is a mechanic hired and assigned to the mechanic shop at the same facility as Lim-Tom, Broderick, and before his termination, Donald Matthews. Plaintiff is responsible for moving about 8 – 12 trucks out of the building at the start of his shift which begins at 3:00 a.m., Tuesday through Saturday. The trucks have to be moved to allow the trucks parked at the platform exit space from the building. As drivers arrive they bring the trucks back in to be loaded at the platform. The Mechanic shop starts approximately 10 – 12 feet at one end of the platform. The mechanic shop is an open area, unsecure from truck drivers, rack loaders, delivery people and other depot personnel. Employees have to enter the mechanic shop to punch in. Plaintiff Robert Dingle, Jr. is employed at the facility and works the 3:00 a.m. to 11:30 a.m. shift. He is also responsible for the maintenance and repair of approximately 30 trucks. He is also responsible for road calls which are on the road repairs. Plaintiff works under mechanic shop Foremen Cecil Douglas whose shift starts at 8:00 a.m. which is 5 hours after the Plaintiff starts his work day. Both Mr. Dingle and Mr. Douglas work for the Fleet Division of the company. They are supervised by Thomas Leggio, Assistant Fleet Supervisor and Pete Villa Fleet Supervisor both of whom have offices in Bayshore, NY.

Pete Villa rarely visits the Troy Avenue depot where Plaintiff works. Mr. Leggio visits the depot 4 – 6 times a month. John Ianiro was a supervisor for the Troy Avenue depot. He was assigned to supervise the truck drivers and oversee the functions of the depot and he was a direct report to Frank Gadero which supervised this depot as well as a depot in Mineola. Neither Ianiro nor Gadero actually oversaw nor supervised the mechanic's. If they have/had a problem with the mechanics, they contact Tom Leggio or Pete Villa. Plaintiff is self-supervised for 5 hours of his shift. In the absence of Foreman Cecil Douglas, plaintiff assumes the title1 of acting Foreman. If Mr. Douglas does not work a particular day or is on vacation (see exhibit A, page 2), plaintiff is paid Mr. Douglas' salary/rate of pay in addition to time ½ when he works a double shift. He is not a subordinate of Mr. Lim-Tom, Lim-tom has no authority over plaintiff.

1

The Premise of this case is sexual harassment in that Mr. Lim-Tom and Mr. Broderick distributed a photo of a nude male which resembled plaintiff to other employees at the depot including the mechanic Forman Cecil Douglas (via text message). They made lewd and degrading comments to plaintiff and literally badgered plaintiff by stating he had a small penis and other despicable remarks including remarks about Lim-Tom having a penis pump that he wanted to sell to the plaintiff. This continued for approximately a month or more wherein they continued to make lewd, obscene and degrading remarks to others portraying the plaintiff as a social deviant, a freak and a homosexual which is all a violation of company policy (see exhibit A attached hereto titled "Harassment Policy").

What is interesting about the policy is, it clearly states, "the victim of sexual harassment can be female or male. Sexual harassment can occur between associates of the same sex." It further suggests sexual harassment is established when such conduct has the purpose or effect of unreasonably interfering with an associates work performance or creating an intimidating hostile or offensive working environment. It defines sexual harassment as, visual conduct such as leering, making sexual gestures, displaying sexually suggestive objects or pictures, cartoons, calendars or posters. Verbal conduct such as making or using derogatory comments, epithets, slurs, sexually explicit jokes or comments about an associates body or dress.

I must stress here, the company policy is a posted policy. I must also stress Lim-Tom, Broderick and Douglas has been with the company for periods of 10 to 21 years, respectively. They are all thoroughly familiar with company policy and violations thereof. Mr. Ianiro, Mr. Gadero and Rina Carpano of Human Resources are all knowledgeable of company policy and procedures in matters such as these. In fact during the investigation, Mr. Broderick, Mr. Douglas and Mr. Lim-Tom acknowledged having seen or having knowledge of the photo and they admitted they should have reported this in accordance with company policy. See attached (see exhibit A, titled "Investigations and Complaints") ,( Exhibit B Investigation Report of Frank Gadero and John Ianiro, page 6).

I must further stress to the court, the company does not recognize the desire or goal of sexual activity a pre-requisite of sexual harassment. The policy is clear and concise. It is written in a manner that is understandable as well as un-ambiguous so as to be read meaningfully and without interpretation to "ALL" company personnel regardless of their levels of education. It is also important to note, in cases involving sexual harassment between two women, the issue of sexual desire has never been raised. I also firmly assert that a common element or thread in sexual harassment cases is that the harasser in some way attempts to impose his/her will on a subordinate because of his/her authority which may also lead to some type of psychological or sexual gratification. However, according to company policy, plaintiff was sexually harassed; however, the company failed to investigate and penalize those responsible for the harassment

of plaintiff. Simply put, the company failed to follow its own policy and impose penalties for violations thereof.

The company also failed to comply with its own policy regarding complaints and investigations (see exhibit C, "Complaints and Investigations"). The policy states, "the company will promptly and thoroughly investigate any report of policy violation, and appropriate corrective and preventative action will be taken. All associates who violate this policy willingly provide false information regarding the original compliant, or the investigation or refuses to cooperate with an investigation will be subject to immediate disciplinary action, up to and including termination."

Plaintiff complained of being sexually harassed by Brian Lim-Tom and Leon Broderick. The grievance was given to Frank Gadero and he and John Ianiro commenced an investigation (see exhibit B "Investigation Report"). Joe Paravati (supervisor of truck drivers) nor Frank Gadero nor John Ianiro interviewed the entire staff at the depot during their investigation. However, Gadero did interview the mechanic Foreman Cecil Douglas (see exhibit A, page 6). During his interview, Cecil Douglas admits not only to having seen the photo but he received the same via text message. Mr. Douglas is the only one that actually admitted to Mr. Gadero and Mr. Ianiro that he had a copy of the photo in his phone. He also stated, he could not remember who sent him the text containing the photo. Both Gadero and Ianiro are familiar with text messaging. Accordingly, the sender's information would be in Douglas' phone and the senders name or number would show before the message or photo can be opened or received. Mr. Douglas was not pressed on this issue by either investigator. Neither sanctions nor penalties were leveled against Mr. Douglas for giving false statements or failing to cooperate fully with the investigation, especially considering he is a Foreman. Mr. Douglas told plaintiff about the photo shortly after he received it, he stated: "Brian sent it to me while I was here working on the garage door and I was really pissed off."

The photo was a gag photo which depicted a nude male with a caption underneath saying, "Tell your man stop sending sexy photos of himself, I don't want his ass." Seems the photo was retrieved from some internet site. In fact, Mr. Lim-Tom infers that at the hearing (see exhibit C attached hereto).

During the investigation, Lim-Tom stated, "Mr. Dingle was sent the picture by his girlfriend and it was Mr. Dingle who was giving it out. He said he had not seen the photo (see exhibit B, page 5) where Mr. Lim-Tom stated, "I first saw the picture when plaintiff and fellow employee Mark Mcken showed it to me" (see exhibit C attached hereto). Mr. Lim-Tom told plaintiff that Broderick had sent him the photo via text message,(plaintiff has submitted CD's of himself and Lim-tom discussing the fact that Broderick had been the one who distributed the photo, please listen to them). On the other hand, during the investigation Mr. Broderick

3

admitted to seeing the photo but did not say who showed it to him. He further states, "Mr. Dingle has anger issues". In addition, both Lim-Tom and Broderick were allowed to give character assessments of plaintiff and included two people to corroborate their theory. Mr. Broderick was allowed to make claims against plaintiff at the hearing as follows:

Broderick stated, "plaintiff showed him the photo and stated to Broderick, I know you like men, I know you like dick." (see exhibit C). Broderick goes on to say that plaintiff: "Threatened to shoot, supervisor Tom Leggio because they had a disagreement regarding p.m.'s, (Exhibit C, page 2) Broderick although he claims in part that plaintiff showed him the photo in his next breath he says plaintiff questioned him about texting the photo. (see Exhibit B and C)

What is most appalling about the whole thing is that because of the statements of Mr. Broderick, Mr. Lim-Tom and Mr. Matthews, plaintiff was made to look like a belligerent psychopath. The company forced him to attend anger management sessions for 1 year with an out of pocket expense to plaintiff of over $200 and suspended him for one day without pay. More appalling is the fact that Gadero, Ianiro and Carpano all knew the company policy had been violated and made a conscious effort to sweep the entire thing under the rug, a blatant violation of company policy.

(Please listen to CD's of September 30, 2010 which is a meeting between Frank Gadero, Rina Carpano, Robert Dingle and James Moore, Shop Steward.) At the meeting Ms. Carpano and Mr. Gadero empathically declared that "No one has substantiated the claim that there was a photo".

The company did not follow its own policy, they violated my 5th and 14th amendment rights to due process and equal protection of the law. And they violated Title VII of the Civil Rights Act of 1964.

## II Plaintiff is the victim of a hostile work environment in violation of Article 7.

During the whole ordeal, plaintiff has been the brunt of hostility. On numerous occasions, he has been cursed out by drivers for putting their trucks outside and for not having extra keys to their truck, etc. There were several occasions when the Thrift Store Manager, Ingrid Prawl, would get into an argument with other employees of the company, she would make statements such as, I am not Robert, I will split your ass open. Aside from latter, plaintiff was preparing to move a truck out of the work bay on December 17, 2011, wherein, he had just serviced the truck and replaced the front brakes. He pumped the brakes as is standard procedure, and the pedal lost pressure. The plaintiff exited the truck to see why the brakes lost pressure, (had no brakes). It was determined that the hydro-boost unit had been disabled. The hydro-boost unit is a mechanism that attaches directly to the brake pedal. The retaining clip

that holds a rod in place that attaches to the brake pedal had been propped in such a way that it would come out. Plaintiff could have been hurt or killed or hurt or killed others. Plaintiff grieved the matter and the matter was investigated. The only person who would know how to dismantle and prop the mechanism from the brake pedal to the hydro-boost system is a mechanic. There is only one other mechanic in the depot and that is Cecil Douglas. After investigating supervisor, Tom Leggio told plaintiff that he investigated and he found that the wrong unit had been put in – the unit had been put in a year prior. Mr. Leggio further stated that he also found out that plaintiff was the mechanic who put in the wrong unit. He then told plaintiff that he could forget the whole thing or he would write him up for poor work performance. Plaintiff having investigated himself, found that another mechanic had installed the unit. He then showed this information to Mr. Leggio he apologized. Mr. Leggio also, stated, "That he could not prove anyone tampered with the hydro- boost unit, but he acknowledged that a retaining clip was missing and could not be found (see exhibit D attached hereto).

On October 5, 2010, plaintiff fell down a flight of stairs suffering a broken left ankle and a torn quadriceps tendon of his right knee. He underwent surgery on both his ankle and knee and was out of work on disability for 7 months. When he attempted to return to work he was made to run back and forth, to and from the depot to get the doctors note changed. This was per then secretary Lisa Casaligi, who was supervised by John Ianiro. This delayed my return to work by 6 weeks. Finally, someone who nobody would identify, contacted the Human Resources office, Lisa Williams, stating that they had witnessed plaintiff traveling on Access-A-Ride and walking with a cane, thus the plaintiff should be barred from returning to work. Plaintiff had to get papers from Ms. Williams and have them submitted via email, directly from his doctor's office. According to the Union delegate, Joe Weinbel, the only requirement was to return with a note from the doctor stating plaintiff could return to work. Also, he stated that as long as plaintiff did not come to work with the cane, the company had no grounds for what they did. Plaintiff lost 6 weeks' pay. One year later, the company conceded and plaintiff was paid 6 weeks back pay.

On September 22, 2011, plaintiff was written up for poor work performance when Cecil Douglas left a 4 foot high jack in a blind spot underneath an elevated truck the plaintiff was working on. When plaintiff let the lift down the presence of the jack almost caused the truck to fall off the lift. Mr. Douglas reported the incident to John Ianiro who in turn called supervisor Tom Leggio. According to John Ianiro, Tom Leggio had to write plaintiff up for poor work performance. Plaintiff and Union delegate Joe Weinbel contested the disciplinary report citing it as unfair since Cecil Douglas was the one who left the jack under the truck and did not incur disciplinary action. Mr. Leggio's response was, Cecil Douglas said he did not put the jack there, which is not only a lie, but absurd considering the plaintiff would have no use for a jack since the truck plaintiff was working on was on a lift (see exhibit E, attached hereto).

5

On March 12, 2012, a driver Peter Grossman reported plaintiff to John Ianiro and took pictures of a truck plaintiff was repairing in the trailer bay. The trailer bay is used to wash trucks. It is also used to do truck repairs by plaintiff, Cecil Douglas and other mechanics who have worked at the Troy Avenue depot. Plaintiff and shop steward, James Moore expressed the latter to supervisor Tom Leggio and he stated that the drop light cord presented a safety hazard. Plaintiff explained to Mr. Leggio, there is no written rule against performing truck repairs in that area and that is was discriminatory for Mr. Leggio to issue a write up because no other mechanics were written up for it. Plaintiff also explained to Mr. Leggio that the hose used to wash the trucks is spread out in a greater more high risk manner as the drop cord. Mr. Leggio stated that because he was contacted by John Ianiro and Mr. Grossman took pictures he had to issue a written warning, in which he states the next "poor work performance" is a suspension. According to the Union delegate Joe Weinbel "they (company) pile poor work performance reports against people, suspend them and pile more report against them to terminate them (see report attached hereto as exhibit F)

Most of the people who were at the depot during the sexual harassment are still present with the exception of John Ianiro, who was transferred for allowing Broderick, a working Foreman, to sit in his office and converse with him for half of Broderick's shift. Mr. Ianiro was transferred in May 2012. Mr. Gadero left the Troy Avenue depot shortly after the last meeting with plaintiff (September 2011).

After plaintiff attended the hearing of May 3, 2010, Mr. Douglas began meeting with Mr. Ianiro outside of the depot every morning. Periodically Mr. Douglas would tell plaintiff that Mr. Ianiro was making sarcastic remarks about him (plaintiff). Mr. Douglas also spent the entire two weeks before Ianiro left, in Mr. Ianiro office. Plaintiff is becoming very uncomfortable with Mr. Douglas and requested a time change so he did not have to be around Mr. Douglas as much. Mr. Douglas fought against the time change. Plaintiff is also continually told by employees at the depot, "that nobody likes him. Plaintiff has become so stressed and depressed, at times he cannot sleep and has to take anti-depressants along with sleeping pills. He is under a care with a Psychiatrist and a counselor's care.

In a meeting held on July 3, 2012 where, Union delegate Joe Wienbel, Tom Leggio and plaintiff came together to discuss vindictive write ups and the work relationship between Mr. Douglas and plaintiff. Joe Wienbel expressed the fact that Mr. Dingle had been going through all of these things because of the sexual harassment case and Mr. Leggio did not disagree.

Plaintiff is now 53 years old and although he came to Entenman's with the intentions of retiring, he realizes and has expressed to his superiors that because of all that has transpired he will never be able to retire from Entenman's. At 53 years old and given the state of the

economy, it is only somewhat likely that he will land a union job with a pension and medical coverage. Now, attorneys for the defendant's, at the EEOC stage, suggested that the case should have been handled in accordance with the "Collective Bargaining Agreement", i.e., arbitration (see exhibit B, page 2).

In fact, plaintiff, after receiving and reviewing the hearing minutes and the investigation, plaintiff made a request to Joyce Alston, Union President to arbitrate, but Ms. Alston informed him that it was too late. Basically, had the company followed its own policy & procedure, the case would not be before the court today.

### III Defendant's defamation Claim cannot be barred by Statute of Limitations.

The company refused to release copies of its investigation to plaintiff or the Union. Exhibit B comes from papers submitted by defendant lawyers to the EEOC. Those papers were received from the EEOC in March 2011. Exhibit C, minutes of hearing was received in August 2010 after Plaintiff filed a grievance to the Union President, Narcisso Martas (see exhibit G). G Because there was misconduct and a hindrance by the company, the statute of limitations cannot be applied. (NY2d New York Jurisprudence 2b subd.55).

### CONCLUSION

Plaintiff's sexual harassment claim should be evaluated in accordance with company policy, (Holiday Inns Inc. and Holiday Inns(Lebanon) Inc. v. Aetna Insurance Co. 77CV2623-CSH, Ajay Chanchani and Bharati Chanchani v. Salomen/Smith Barney 99 CIV 9219 RCC, 200 US DIST. Lexis 2036) Moreover, plaintiff's claim should not be dismissed because plaintiff has sustained a great deal of duress/mental anguish. Plaintiff has suffered repeated abuse and it has affected the terms and conditions of his employment, defendant's motion to dismiss should be denied.

Because defendant's withheld records of the investigation of plaintiff's claim of sexual harassment, thereby breaching the Collective Bargaining Agreement and hindered an alternative method of resolution thus violating his due process rights under the 14th amendment of the United States constitution, defendant's motion to dismiss should be denied.

Furthermore, since defendant's knowingly and willingly violated company policy, labor law and plaintiff's civil and human rights, defendant's motion to dismiss should be denied.

Finally, since it is against the law for an attorney to knowingly present false evidence and there can be no plausible reason why defendant's abandond company policy defendant's motion to be dismissed should be denied, (NYDR 7-102, rule 3.1).

    Wherefore plaintiff seeks damages as follows:

        $5,000,000 for Sexual Harassment

        $5,000,000 for Mental Anguish

        $5,000,000 for Discrimination

        $5,000,000 for Bias

        $5,000,000 for Gross Negligence

        $5,000,000 for Defamation Character