# EXHIBIT A



# Harassment Policy

**BIMBO BAKERIES USA**

---

**Effective Date:  June 1, 2010**

BBU is committed to providing all associates with a workplace free of unlawful harassment. The Company will not tolerate harassment by any person against any associate, vendor, customer or applicant on the basis of race, color, religion, national origin, gender, age, disability, sexual orientation, veteran status or any other personal characteristic protected by law.

No associate of the Company is expected to tolerate conduct prohibited by this policy while at work or engaged in Company business.

*SEXUAL HARASSMENT*

Sexual harassment includes unwanted sexual advances, requests for sexual favors or other visual, verbal or physical conduct of a sexual nature when:

- Submission to or rejection of such conduct is made a condition of employment or is used as a basis for employment decisions affecting the individual; or,
- Such conduct has the purpose or effect of unreasonably interfering with an associate's work performance or creating an intimidating, hostile or offensive working environment.

The following is a partial list of conduct that would be considered sexual harassment:

- Unwanted sexual advances.
- Offering employment benefits in exchange for sexual favors.
- Making or threatening retaliation after a negative response to sexual advances.
- Visual conduct such as leering, making sexual gestures, displaying sexually suggestive objects or pictures, cartoons, calendars or posters.
- Verbal conduct such as making or using derogatory comments, epithets, slurs, sexually explicit jokes and comments about an associate's body or dress.
- Written communication of a sexual nature distributed in hard copy or via a computer network.
- Unwelcome physical conduct such as touching, assault, impeding or blocking movements.
- Retaliation for making harassment reports or threatening to report harassment.

The victim of sexual harassment can be female or male. Sexual harassment can occur between associates of the same sex.

## OTHER TYPES OF HARASSMENT

The Company also prohibits other types of harassment including the following:

- Verbal conduct such as threats, epithets, derogatory comments or slurs or other inappropriate communications.
- Visual conduct such as derogatory posters, photographs, cartoons, drawings and gestures.
- Written communications containing offensive statements directed to individuals in a particular group because of their personal characteristics, such as racial or ethnic stereotypes or caricatures.
- Physical conduct such as assault, unwanted touching or blocking of normal movement and any form of bullying or intimidating behavior
- Retaliation for making or threatening to make harassment reports to the Company, or for participating in an investigation into harassment allegations.

## HARASSMENT COMPLAINT PROCEDURE

Any associate who believes he or she has been subjected to harassment prohibited by this policy should immediately tell the harasser to stop their unwanted behavior and immediately report that behavior, preferably in writing, to their supervisor, any other management official or a member of the Human Relations department.

**A confidential toll-free number is also available to report workplace problems such as harassment, discrimination and other work-related issues: 1-877-888-0002. This hotline is available 24 hours a day, 7 days a week. The hotline connects the associate to a third party who will take all relevant information and contact the Company which will investigate the complaint.**

When a report is received, the Company will conduct a prompt, thorough and objective investigation of any harassment claim. This investigation will be as confidential as possible, consistent with a complete investigation.  If the Company determines that prohibited harassment has occurred, it will take appropriate action to ensure the conduct will not reoccur.  Communication regarding the outcome of the investigation will be made. The type of discipline administered will be dependent upon the severity of the conduct, as well as other factors presented in the particular circumstances. Associates violating the policy are subject to discipline up to and including termination.

The Company strictly prohibits retaliation against any person for reporting harassment or for assisting in an investigation.  Prohibited retaliation includes threats, termination, demotion and suspension, failure to hire or give equal consideration in making employment decisions, adversely affecting working conditions or otherwise denying any employment benefit.

The Company does not consider conduct in violation of this policy to be within the course and scope of employment and does not sanction such conduct on the part of any associate, including management associates.



**BIMBO BAKERIES USA**

# Complaints and Investigations

**Effective Date:  June 1, 2010**

BBU encourages associates who believe they or a co-worker have been subject to employment discrimination, harassment or other policy violations to report it immediately to his or her supervisor.

Associates who are not comfortable reporting the inappropriate conduct to their supervisor, may report the issue to the Human Relations Department or the highest ranking manager at the facility where the associate works.  If an associate is not comfortable bringing the complaint to the attention of any of the individuals referenced above, he or she may call the confidential Network Hotline number, 877-888-0002. This Hotline is available 24 hours a day, 7 days a week.  The hotline connects the associate to a third party who will take all relevant information and contact the Company which will investigate the complaint.

*Company Investigation*

The Company will promptly and thoroughly investigate any report of policy violation. Appropriate corrective and preventative action will be taken.  Complaints and investigations will be treated as discreetly as possible, consistent with the Company's thorough review of the issues involved.  Managers and associates are responsible for immediately notifying the Human Relations and Legal Departments upon receipt of a claim, and all associates are required to fully cooperate in an investigation.

An associate who violates this policy, willingly provides false information regarding the original complaint or the investigation, or refuses to cooperate with an investigation will be subject to immediate disciplinary action, up to and including termination.

The Company will not tolerate any form of retaliation against individuals who, in good faith, report prohibited conduct or who cooperate in the investigation of such reports.

# EXHIBIT B

In his Charge, Mr. Dingle makes two (2) allegations: (1) he was discriminated against on the basis of his sex as he was subjected to sexual harassment by two male co-workers; and (2) he was subjected to retaliation after he complained to Company management about the alleged sexual harassment. These allegations are not supported by the limited facts recited in Mr. Dingle's Charge or by the facts set forth in this Position Statement.

## I.   Brief Answer

The Company vigorously denies Mr. Dingle was subjected to any form of sexual harassment or discrimination on the basis of his sex. The Company further denies that it retaliated against Mr. Dingle after he complained of the alleged sexual harassment. Decisions regarding employment and employment conditions at the Company are based solely upon an individual's abilities, performance and behavior, without regard to sex or any other impermissible basis pursuant to the Company's anti- harassment policy, as set forth in detail in Section III of this Position Statement.

Mr. Dingle's Charge fails to establish that he was subjected to sexual harassment that was severe or pervasive so as to create a hostile work environment. In addition, Mr. Dingle's Charge fails to establish that the Company retaliated against him as there is no causal connection between his complaint to his supervisors of the alleged sexual harassment and the alleged adverse action.

Mr. Dingle's Charge lacks merit and the Commission should dismiss the Charge with a finding of no probable cause.

## II.   Factual Background

The Company bakes and distributes several brands and varieties of fresh bread and cakes for ultimate sale to grocery stores, fast-food chain restaurants and other outlets. The Company's products are distributed out of various depots across the country, including its Brooklyn, New York depot (the "**Brooklyn Depot**"). The Company hired Mr. Dingle on January 6, 2009 as a mechanic assigned to the Brooklyn Depot. In his position as a mechanic, Mr. Dingle performs repairs on and services the trucks used by Company employees to deliver the Company's products. Mr. Dingle worked the overnight shift, starting at 2:30/3:00 am.

At all times during his employment, Mr. Dingle has been a member of Bakery, Confectionary, Tobacco Workers and Grain Millers International, AFL-CIO Union Local No. 3 (the "Union"). The relationship between the Company and the Union is governed by a Collective Bargaining Agreement ("the CBA"). Article VI of the CBA sets forth a procedure for the resolution of all complaints and grievances. [2]

At all times during his employment, Mr. Dingle reported to Tom Leggio, Fleet Maintenance Supervisor. Mr. Leggio oversees several depots, including the Brooklyn

---

[2] Attached hereto as Exhibit A and incorporated herein by reference is a copy of Article VI of the CBA.

2

Depot. He is not present at the Brooklyn Depot on a daily basis. The operations at the Brooklyn Depot are overseen by an Area Manager. At all times relevant hereto, the Brooklyn Depot was overseen by Area Manager, Frank Gadero.[3] Mr. Gadero had two (2) Territory Sales Managers, John Ianiro and Joe Paravati, reporting to him and managing the Brooklyn Depot on a daily basis.

On the morning of April 8, 2010, Mr. Gadero received a telephone call from Mr. Ianiro notifying him that there had been an incident at the Brooklyn Depot during the overnight shift. Mr. Ianiro reported that a physical altercation had occurred between Mr. Dingle and another employee, Donald Matthews.[4] Mr. Ianiro advised Mr. Gadero that Mr. Dingle called the police and Mr. Leggio after the altercation. Mr. Gadero directed Mr. Ianiro to initiate an investigation. Mr. Gadero was originally scheduled to be at another depot, but he changed his plans and immediately proceeded to the Brooklyn Depot after receiving Mr. Ianiro's telephone call. He also contacted Rina Carpano, Human Relations Manager, and reported the incident.

Upon arriving at the Brooklyn Depot, Mr. Gadero met with Mr. Ianiro and Mr. Paravati to determine the extent of their initial investigation. Mr. Ianiro and Mr. Paravati advised that Mr. Matthews had left the depot immediately after the altercation, but they had interviewed Mr. Dingle and Mr. Dingle had provided his version of the altercation and the events leading up to the altercation.

Mr. Ianiro and Mr. Paravati also advised Mr. Gadero that during their conversation with Mr. Dingle about the incident, Mr. Dingle alleged that he was being sexually harassed by Bryan Lim-Tom and Leon Broderick, rack loaders at the Brooklyn Depot. Mr. Dingle claimed that Mr. Broderick had a picture on his phone of a naked man who resembled Mr. Dingle and that the employees were making fun of him.

Mr. Ianiro and Mr. Paravati provided Mr. Gadero with the following information provided to them by Mr. Dingle:

Drivers were moving trucks from the platform to the trailer bay. On April 7, 2010, Mr. Lim-Tom asked Mr. Dingle to move a truck out of the trailer bay. Mr. Dingle did not believe it was his responsibility as a mechanic to move trucks. Mr. Dingle acknowledged having an argument with Mr. Lim-Tom about this issue. According to Mr. Dingle, the argument involved cursing by Mr. Dingle and Mr. Lim-Tom as well as threats by both to take the argument "outside."

According to Mr. Dingle, on April 8, 2010, Mr. Matthews approached him regarding the issue of moving trucks. Mr. Dingle told Mr. Matthews that it was not his responsibility to move the trucks. Mr. Dingle acknowledges that a verbal argument ensued and he told Mr. Matthews "to get the F out of my face". Mr. Dingle stated that Mark McKen, another employee, got between Mr. Dingle and Mr. Matthews. Mr. Matthews started to walk away, but then turned

---

[3] As of October 10, 2010, Mr. Gadero was transferred to another position within the Company and was no longer the Area Manager of the Brooklyn Depot. Mike Amello took over as the Area Manager of the Brooklyn Depot at that time. Mr. Amelio remains in that position today.
[4] Mr. Matthews held the position of rack loader. He was also a Union Shop Steward.

back and tackled Mr. Dingle into a desk. There was a scuffle and they were going to take the fight outside, but instead Mr. Dingle called the police and his supervisor, Mr. Leggio.

After hearing Mr. Dingle's version of the incident as reported by Mr. Ianiro and Mr. Paravati, Mr. Gadero initiated an investigation into the physical altercation and the new allegation of sexual harassment. Mr. Gadero's investigation included interviews of the following employees: Mr. Dingle; Mr. McKen; Mr. Matthews; Mr. Lim-Tom; Mr. Leggio; Leon Broderick; Cecil Douglas; Gary Gerken; and John Villano. He also spoke with Tai Liang, an outside driver who delivers to the depot.

On April 8, 2010 at approximately 10:00 am, Mr. Gadero met with Mr. Dingle. Also present at the meeting were supervisors Ianiro and Paravati and Gary Gerken, a receiver at the Brooklyn Depot and a member of the Union.[5] Mr. Dingle stated that Leon Broderick, a rack loader at the Brooklyn Depot had a picture of a naked man on his phone. According to Mr. Dingle, Mr. Broderick sent it to "a lot of guys." He identified Mr. Lim-Tom and Mr. Matthews as co-workers who got the photo and ridiculed him. Mr. Dingle stated that the ridicule "bottled up" and lead him to blowing up when Mr. Lim-Tom asked him to move the truck on April 7, 2010. This carried over to April 8, 2010, when Mr. Matthews approached him to speak about the moving of trucks. Mr. Dingle admitted that he lost his temper with Mr. Matthews and he was cursing and arguing with Mr. Matthews. He stated that Mark McKen, had to physically separate him and Mr. Matthews. Mr. Matthews initially started to walk away, but then he turned around, rushed at Mr. Dingle, grabbed by him the shirt and pushed him into a desk. According to Mr. Dingle, they struggled for a bit and Mr. Matthews released him. They then agreed to take "it outside." While walking outside, Mr. Matthews apologized and said there was no reason to go outside. Mr. Dingle stated that at that point he had had enough and called the police.

On April 8, 2010 at approximately 10:30 am, Mr. Gadero met with Mr. McKen. Mr. McKen was the Sanitor for the Brooklyn Depot. Consistent with Mr. Dingle's interview, Supervisors Ianiro and Paravati and Mr. Gerken were present. Mr. McKen confirmed that on April 7, 2010, he witnessed an argument between Mr. Dingle and Mr. Lim-Tom. The argument occurred after Mr. Lim-Tom asked Mr. Dingle to move a truck from the trailer well. Mr. McKen also confirmed that on April 8, 2010, he witnessed an argument and physical altercation between Mr. Dingle and Mr. Matthews after Mr. Matthews, "acting as shop steward" approached Mr. Dingle to discuss the moving of trucks. Mr. McKen stated that Mr. Dingle and Mr. Matthews got "face to face" and he, Mr. McKen, separated them. After initially walking away, Mr. Matthews turned back and attacked Mr. Dingle, throwing him on the desk.

Following the interview of Mr. McKen, Mr. Gadero contacted Ms. Carpano, HR Manager. Mr. Gadero relayed the results of his investigation to that point, and a decision was made by Mr. Gadero and Ms. Carpano to suspend Messrs. Matthews, Lim-Tom and Broderick without pay, pending completion of the Company's investigation. Mr. Gadero contacted Joe Weinbel, the Union Business Agent, and informed him of the suspensions. Mr. Weinbel notified Messrs. Matthews, Lim-Tom and Broderick of their suspensions.

---

[5] Mr. Gadero chose to have Mr. Gerkin present during Mr. Dingle's interview and the other employee interviews because he is a member of the Union and the Shop Steward was unavailable.

4

On April 8, 2010 at approximately 3:30 pm, Mr. Gadero met with Mr. Matthews. Consistent with Mr. Dingle's interview, Supervisors Ianiro and Paravati and Mr. Gerken were present. According to Mr. Matthews, he received a telephone call from Mr. Broderick on April 7, 2010 informing him that Mr. Lim-Tom was having an issue with Mr. Dingle regarding the moving of trucks. Mr. Broderick told Mr. Matthews that he and Mr. Lim-Tom, as rack loaders, are not authorized to move company vehicles. Mr. Broderick also advised that Mr. Dingle and Mr. Lim-Tom had a heated argument when Mr. Dingle refused to move a truck out of the trailer bay. Mr. Broderick advised Mr. Matthews that Mr. Dingle was cursing and shouting.

Mr. Matthews stated that on April 8, 2010, in response to the call from Mr. Broderick, he approached Mr. Dingle to discuss the truck moving issue. Mr. Dingle stated that a driver had moved a truck into the trailer bay and his supervisor (Mr. Leggio) had advised him that he did not have to move trucks. According to Mr. Matthews, he then told Mr. Dingle that Mr. Lim-Tom was the foreman and if he asked Mr. Dingle to move the truck, then Mr. Dingle needed to move the truck. When Mr. Dingle refused, Mr. Matthews advised him that the supervisor, Mr. Ianiro, would have to speak with him. At this point, Mr. Dingle began to curse and shout in Mr. Matthews face. According to Mr. Matthews, Mr. Dingle pushed the desk.

On April 8, 2010 at approximately 3:45 pm, Mr. Gadero interviewed Mr. Lim-Tom. Consistent with Mr. Dingle's interview, Supervisors Ianiro and Paravati and Mr. Gerken were present. When asked about the naked picture, Mr. Lim-Tom advised that he had not seen the picture, but it was his understanding that it was Mr. Dingle's girlfriend who sent the picture to Mr. Dingle's cell phone and that Mr. Dingle gave it out. According to Mr. Lim-Tom, Mr. McKen was the first one to see the picture and that Mr. Dingle told Mr. McKen that his girlfriend sent him the picture. Mr. Lim-Tom expressed that Mr. Dingle was a problem in the Depot and that Mr. Tai Liang, an outside driver who delivers to the Brooklyn Depot would no longer deal with Mr. Dingle.

On April 8, 2010 at approximately 4:05 pm, Mr. Gadero interviewed Mr. Broderick. Consistent with Mr. Dingle's interview, Supervisors Ianiro and Paravati and Mr. Gerken were present. Mr. Broderick admitted to seeing the picture, but denied sending it to other employees. Mr. Broderick stated that Cecil Douglas (the lead mechanic) lied to Mr. Dingle by telling Mr. Dingle it was Mr. Broderick who was giving out the photo. Mr. Broderick stated that Mr. Dingle had "anger issues". He described an incident where he witnessed Mr. Dingle threaten Mr. Leggio and make the statement "I'm a gangster not a mechanic." Mr. Broderick claimed he had to separate Mr. Dingle and Mr. Leggio.

On April 9, 2010, Mr. Gadero interviewed Mr. Leggio, Mr. Dingle's immediate supervisor. Mr. Leggio stated that he received a call from Mr. Dingle on April 8, 2010 at approximately 3:25 am. Mr. Dingle told Mr. Leggio that he had had an argument with Mr. Lim-Tom the previous night and an argument with Mr. Matthews that night. Mr. Leggio stated that he went to the Brooklyn Depot and spoke to Mr. Dingle and Mr. McKen. Mr. Leggio stated that he was unaware of Mr. Dingle's allegation regarding sexual harassment and the naked picture until April 8, 2010 at approximately 4:30 pm when Mr. Dingle called him and informed him that Messrs. Matthews, Lim-Tom, and Broderick were being

suspended. According to Mr. Leggio, Mr. Dingle never mentioned the picture or any alleged sexual harassment prior to April 8, 2010.

On April 13, 2010, Mr. Gadero interviewed Cecil Douglas. Mr. Ianiro and Mr. Gerkin were present. Mr. Douglas stated that he received the picture on his cell phone, but he could not recall who sent it to him. Mr. Douglas stated that he was 99% sure it was Mr. Dingle in the picture. Mr. Douglas recalled hearing Mr. Lim-Tom and some of the drivers talking about the picture, but he never saw anyone speak to Mr. Dingle about the picture. Mr. Douglas mentioned that Mr. Dingle had a "bad temper".

On April 13, 2010, Mr. Gadero interviewed Mr. Gerkin. Mr. Ianiro and Mr. Douglas were present. Mr. Gerkin said he had heard about the picture, but he never saw it. He never saw anyone taunt Mr. Dingle about the picture. Mr. Gerkin did not witness the incident between Mr. Dingle and Mr. Lim-Tom or the incident between Mr. Dingle and Mr. Matthews.

On April 13, 2010, Mr. Gadero interviewed Tai Liang, an outside driver who makes deliveries to the Brooklyn Depot. Mr. Liang stated that he did not know anything about the picture. He did describe a problem he had with Mr. Dingle. He described an incident approximately a week earlier when he asked Mr. Dingle to move a truck. According to Mr. Liang, Mr. Dingle began cursing and yelling at him, and said "maybe you need to go back to driving school in China and learn how to drive a truck!" After that incident, Mr. Liang avoided Mr. Dingle. Mr. Liang stated that he witnessed the April 7, 2010 incident between Mr. Dingle and Mr. Lim-Tom. According to Mr. Liang, Mr. Dingle was yelling and cursing at Mr. Lim-Tom.

On April 14, 2010, Mr. Gadero interviewed John Villano, a driver who works out of the Brooklyn depot. Mr. Villano had no knowledge of the picture. He had no knowledge of the incident between Mr. Dingle and Mr. Matthews. Mr. Villano did state that Mr. Dingle has an "explosive nature". Mr. Villano described an incident when Mr. Dingle was cursing at Mr. Lim-Tom after Mr. Lim-Tom asked Mr. Dingle to move a truck from the trailer bay. Mr. Villano said he heard Mr. Dingle tell Mr. Lim-Tom "you don't know who you're dealing with I'm a gangster."

Based on the Company's investigation, as outlined above, Mr. Gadero made the following findings:

1. Mr. Dingle exhibited inappropriate abusive behavior, including yelling and cursing, on at least three occasions. All three instances were witnessed by other employees. In addition, in two of these instances, Mr. Dingle admitted to his inappropriate behavior.
2. Mr. Matthews physically assaulted Mr. Dingle.
3. Mr. Broderick denied circulating the picture or taunting Mr. Dingle about the picture, but he admitted to seeing the picture. He should have reported the existence of the picture to management.
4. Mr. Lim-Tom denied seeing or circulating the picture. He also denied taunting Mr. Dingle. He admitted he was aware of the picture. He should have reported it to management.

6

# EXHIBIT C

## Investigation Complaint – Robert Dingle – May 3rd, 2010:

Robert Dingle, who works at the Entenmann's Brooklyn Depot, put in a complaint to the Company claiming he was grabbed and tackled to the floor by another employee, Donald Matthews, who also works at the Brooklyn Depot. Mr. Dingle claims there was a witness present at the time.

Meeting of Entenmann's Management & Union – Present at meeting: Rena Carpano, H.R. Manager, Frank Cardaro, Brooklyn Depot Manager, Tom Leggio, Supervisor, John ____ , Supervisor and Joseph Weinbel, Local 3 Union Representative.

## Robert Dingle's statement:

On April 8, 2010, at 8:00 a.m., John (Supervisor) called Frank Cardaro about the incident. Frank said to start the investigation. Tom Leggio was also there at the time. He had said that Brian and him had some words. The issue was about moving the trucks and leaving the doors open. Robert claims his job is to just the lane open for the trucks. He said that Brian told him you would not talk to me that way outside. Robert said that when Donald Matthews came towards him Mark M. came between Donald and myself. He said Leon and Brian were showing pictures to the other employees in the depot. A young lady told him she saw a picture that looked like him. Robert said he seen it from a girl friend that told him about it. He said Leon, Donald and Brian were all talking and kidding and teasing him. Robert said he had some words (argument) with Tom Leggio and Donald was called in to mediate the issue. He did say that he cursed at Tom Leggio and Mark M. was a witness who was in the area when Donald ran towards Robert and Robert went towards Donald. Robert said that Donald didn't say anthing to him but ran up and tackled him to the floor. Donald was on top of him and they both got up and Donald said to him let's go outside. Donald then must have realized what he did. Donald then put his arm around him. He knew what he did. Robert said if he knew that Donald was going to get fired he would never have called the cops. He said he would not have a problem with Donald coming back to the depot. He has a problem with his pay.

Rena Carpona asked him if he has a problem with his anger and Robert said no. He felt that the investigation was leading towards himself. Rena brought up about issues he had with other people like Tai Lang, Veronica and Tom Leggio. She also brought up about a complaint from Tai Lange that Robert was cursing at him.

## Statement by Leon B:

Leon said he did not see anything between Donald and Robert fighting with each other. Rena asked Leon about the picture that was being showed around. Leon said that the first time he saw the picture was from Robert Dingle. Robert showed him a picture saying you like men and dick and had said that Leon was the one who sent it to Siso who is another employee at the Depot. Leon said be approached Siso about the picture he sent to him. Siso denied getting anything from Leon. Leon said he didn't send any pictures to anyone and he never made fun of Robert Dingle. He didn't discuss the picture with anyone. He said Frank Cardaro (the supervisor) even had a problem with Robert about his pay. The discussion was getting out of hand and Frank threw him out of his office.

## Statement by Brian:

Brian was asked about the picture that was going around the depot of Robert Dingle. Brian said he first saw the picture from Robert and Mark M and they were talking about the picture that was on the internet.

Brian said Robert was bringing him into it because he went to Donald complaining about Robert. That is why Robert is saying he is showing pictures of him. Rena asked did anyone else have the pictures and Brian said no.

Leon explained to Rena: that Tom Leggio went up to Robert Dingle about his PM's and Robert Dingle flipped out on Tom Leggio yelling and cursing at him saying that Tom Leggio is harassing him. He looked as if he was going towards Tom Leggio and that Donald Matthews and himself had to hold Robert Dingle back.. Robert was saying to Tom Leggio to get the fuck out of his face. Tom Leggio looked scared of Robert Dingle. He said this is how people get bullets. Stop harassing me this is how people get bullets. Leon and Donald holding him back.

## Donald Matthews statement:

Donald said he was called by Brian K and he had a problem with Robert Dingle. Donald said Brian and Robert were arguing about moving trucks and whose job it was to move them. Brian claims that Robert was not listening to him. Donald said he went to talk to Robert to calm him down because he was upset but Robert was flipping out pushing chairs and tables around. Donald said he couldn't control him and told Robert that he was calling the supervisor John which he did. Robert called the cops. John told Donald his shift was over to go home. Donald said cops spoke to him and Robert. Frank Cardaro said the company has a witness. Donald said Robert would get out of control even with Tom Leggio his superevisor and that he had to hold back Robert because he was flipping out yelling and cursing Tom Leggio. Donald thought Robert was going to hit him and Tom Leggio looked scared.

## Tommy Leggio statement:

Tommy was questioned about an incident with Robert Dingle. Rena asked Tommy what had happened between him and Robert Dingle. Tommy said he was checking one of Robert's PM's and noticed that one wasn't done. He and Robert had a discussion about the PM conversation but it was not heated. Tommy Leggio did not recall if Robert was cursing at him. He said he did not feel threatened by Robert.

Rena brings up the subject that Donald Matthews will be terminated and she brings up the subject of terminating Robert Dingle but the Union says no for what.

Rena's decisions:

Donald Matthews – terminated
Leon B – paid in full
Brian L – paid in full
Robert Dingle – anger management and one day suspension in order to keep his job.

Mark McKenna  –  917 651 6395
Poss. witness.

# EXHIBIT D

Case 1:11-cv-02879-CBA-VVP Document 25-1 Filed 08/30/12 Page 15 of 29 PageID #: 261

Classification _MECHANIC_          Seniority Date _____

Name of Supervisor _THOMAS LEGGIO_ _____

**WHAT HAPPENED:**

Employee story: When _ON SAT 12/17/11_ Where _BROOKLYN DEPOT (TROY AVE.)_
_WHile preparing To move A TRUCK from THE work_
_Area, whEn prEvENTaTive maintainance was perfored_
_I pumped THE BrakE pedal To seaT THE rear PAds_
_because I had removed THE calipers To cHANgE THE brakE shoes._
_I pumped The brakes TwicE and lost pressurE AT THE pedal_
Date of interview with employee(s) _because THE pedal had been partially disloged_
_(i.e., partially released from THE Hydro boosT unit_

Supervisor story: When _____ Where _____

_After investagation I found the Hydroboost Rod DID come out of booster._
_Rod is held in the booster by A Locking CLip. but Locking clip was not_
_present During The investagation. I could not prove There was Any Tampering_
_with brake System.    I Agree To statement Employee_ _(signature) 12/30/11_

Alleged contract/rule violation _"GrievANce DENied"_

Date of interview with supervisor _December 20, 2011  at 4⁰⁰ pm_
_INVESTIgaTion CompleTED  December 30, 2011 - Supervisor Thomas Leggio_

**WITNESSES**
| NAME(S) | WHAT THEY WITNESSED |
|---------|---------------------|
| _(signature)_ | _INTErview DEC 20, 2011_ |
|  | _STATEmenT Dec 30, 2011_ |
| _(signature)_ | _12-30-11_ |

**DOCUMENTS NEEDED (Check "yes" when received and attach to fact sheet)**

_____ Attendance record.     _____ Work record     _____ Medical record

**\*\*\*USE BACK OF THIS FORM
TO RECORD ADDITIONAL PERTINENT INFORMATION\*\*\***

# EXHIBIT E

**EMPLOYEE WARNING NOTICE**

EMPLOYEE'S NAME: Robert Dingle                          DATE: Sept 22, 2011

DEPARTMENT: Brooklyn Depot Garage  POSITION: Mechanic 1st Class

DATE OF INCIDENT: Sept 21, 2011  TIME: 07:30  LOCATION: Brooklyn Garage

EXPLANATION OF INCIDENT: _____

Robert was Lowering a TRUCK THAT WAS ON THE Vehicle LIFT and Didn't notice That There was a 4" High bumper JACK beneath The Rear of The Vehicle. This caused The Vehicle To shift and Almost fell off The LIFT. I Also spoke To Robert about The use of Personal cell phone. cell can only be used During Breaks and During Lunch.

RECOMMENDED ACTION TAKEN: _____ Poor Job Performance.

EMPLOYEE COMMENTS: _____

SUPERVISOR SIGNATURE: Thomas Leggio  9-23-11

EMPLOYEE SIGNATURE: Robert Dingle Jr. 9/23/11

SUPERINTENDENT SIGNATURE: _____

DELEGATE SIGNATURE: _____

# EXHIBIT F

## EMPLOYEE WARNING NOTICE

EMPLOYEE'S NAME: _Robert Dingle JR._   DATE: _March 3, 2012_

DEPARTMENT: _600_   POSITION: _Fleet Mechanic_

DATE OF INCIDENT: _February 25, 2012_ TIME: _4⁰⁰/AM_ LOCATION: _Brooklyn Depot_

EXPLANATION OF INCIDENT: _____

_Robert created an unsafe condition within the Depot by running an extension cord across an entry door._

RECOMMENDED ACTION TAKEN: _This is a written warning for poor job performance. Failure to comply with company policy will result in further disciplinary action. Robert received a verbal warning for poor job performance on September 20, 2011  Next step  Suspension_

EMPLOYEE COMMENTS: _The area is an actual work area, which has been used by myself and other burghes for years. There is no company nor facility policy nor rule that says no repairs can be done in that area. This report and disciplinary action has been taken against me out of malice, and to further harass me, penalizing me for a rule that doesn't exist, and there no such action has ever been taken against any other mechanic who has done repairs in that area. The latter violates labor law, constitution and my civil rights._

SUPERVISOR SIGNATURE: _Thomas Hoggs_  _3-3-2012_   EMPLOYEE SIGNATURE: _____

SUPERINTENDENT SIGNATURE: _____   DELEGATE SIGNATURE: _____

TE: HUMAN RESOURCES      YELLOW: EMPLOYEE      PINK: DEPARTMENT                PERS 62 (3-83)

## Brooklyn Garage

| | |
|---|---|
| **From:** | Thomas Leggio |
| **Sent:** | Thursday, March 01, 2012 5:24 AM |
| **To:** | Brooklyn Garage |
| **Subject:** | FW: |
| **Attachments:** | photo.jpg; photo.jpg |

**From:** John Ianiro
**Sent:** Wednesday, February 29, 2012 10:15 AM
**To:** Thomas Leggio
**Cc:** Lisa Williams
**Subject:**

Tommy, one of my drivers came into my office last night and showed me these pictures. These photos were taken around 4 am on Saturday February 25th. The first picture is a picture of the door leading to the driver's parking lot. Luckily the driver was aware of his surroundings when he walked in and we had no incident. As the driver was leaving the building to serve his route he brought the situation to Mr. Dingle's attention. Mr. Dingle's response was "you have your pictures just turn them in" Please reiterate with Mr. Dingle the company policy of safety being a condition of his employment. Thank you.

JOHN IANIRO
Area Sales Manager
Entenmann's Division
Brooklyn, NY
516-356-1920



BIMBO BAKERIES USA

1





EXHIBIT G

520 2010 02300



| Telephone: | | Telephone: |
|---|---|---|
| Long Island City Office | | Edison Office |
| Tele: (718) 784-3476 | | Tele: (732) 650-1511 |
| Fax: (718) 784-2927 | | Fax: (732) 650-1030 |
| | | Toll Free: (800) 582-5247 |

# *Bakery Confectionery, Tobacco Workers and Grain Millers International Union*

## AFL-CIO-CLC — LOCAL NO. 53

41-07 Crescent Street, Long Island City, NY 11101
145 Talmadge Road - Suite 17, Edison, NJ 08817

September 22nd, 2010



RECEIVED
MAR 04 2011
EEOC-NYDO-ADMIN

**VIA CERTIFED MAIL**
**R.R. #7007 3020 0002 2303 01717**

Mr. Robert Dingle, Jr.
107-21 154th Street
Jamaica, NY  11433

### Re: Your correspondence – August 27th, 2010

Dear Brother Dingle:

I am in receipt of your letter dated August 27th in which you notified the Union that you are submitting a formal complaint against Secretary-Treasurer Joseph Weinbel.

You indicated to me that you would like to have a copy of both Mr. Weinbels' notes, as well as the company's, with regard to the incident that occurred in the shop. I am able to submit Mr. Weinbels' notes as requested, however, Mr. Weinbel did in fact ask the company numerous times for their notes but they refused. So if you would like to have the company's notes, you will have to subpoena them yourself.

Attached, please find Mr. Weinbel's notes on the incident that occurred in the shop.

Sincerely,

Narciso Marias
President

NM:pm
bctgm:102

cc: B. Cooper, Esq. – Pitta & Giblin, LLC

22

**Only litigants alleging age discrimination must answer Question #11.**

11.    Since filing my charge of age discrimination with the Equal Employment Opportunity

Commission regarding defendant's alleged discriminatory conduct *(check one)*:

_____    60 days or more have elapsed.

_____    less than 60 days have elapsed.

12.    The Equal Employment Opportunity Commission *(check one)*:

_____    has not issued a Right to Sue letter.

✓    has issued a Right to Sue letter, which I
**received** on  7/21/2011           .
                    Date

**NOTE:**    Attach a copy of the Right to Sue Letter from the Equal Employment Opportunity
Commission to this complaint.

WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate,
including injunctive orders, damages, costs, and attorney's fees.

_Robert Dingle Jr._
PLAINTIFF'S SIGNATURE

Dated: 8/30/12

115-55   219 St.
Address
Cambria Hgts. N.Y., 11411
(718)2763894 (516)6725174
Phone Number

rev. 5/1/12

-5-

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 520-2010-02300 |

| New York State Division Of Human Rights | and EEOC |
|---|---|

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. Robert Dingle, Jr.** | **(718) 526-1291** | **06-14-1959** |

| Street Address | City, State and ZIP Code |
|---|---|
| **107-21 154 Street, Jamaica, NY 11433** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **BIMBO'S BAKERIES/ENTENMANN'S BAKERY** | **101 - 200** | **(718) 859-6600** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1500 Troy Ave., Brooklyn, NY 11203** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

**RECEIVED**

**NOV 1 7 2010**

| Street Address | City, State and ZIP Code |
|---|---|

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **03-01-2010**   Latest **05-10-2010**

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am a 51 year old African American male who has been employed as a mechanic by the above-named entity since December 2008.

I believe I have been discriminated against by my employer on the basis of my sex, Male, and in retaliation for my complaints of sexual harassment. Specifically, I was sexually harassed by my coworkers Brian Lim-Tom and Leon Broderick Jr. in March 2010 when they disseminated a picture of a naked man they claimed was me. While this was not a picture of me, they did show it to other coworkers, claim it was me, and make derogatory comments about me based on this naked picture. Supervisors were aware of their actions.

This ongoing sexual harassment created a hostile working environment for me. In early April 2010, I was physically assaulted by a coworker, Donald Matthews, because of the negative opinion of me this sexual harassment created. After this incident, I complained to supervisors John Iano and Frank Gadero about the ongoing sexual harassment, and while both my harassers were suspended with pay, these supervisors then began to retaliate against me for my complaints.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>*Robert Dingle Jr.*<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS<br>(month, day, year)<br>*Nov. 4th 2010* |

| *11/4/2010* | X *Robert Dingle Jr.* |
|---|---|
| Date | Charging Party Signature |

CLAYER FEDRICK
Notary Public, State of New York
No. 41-4946347
Qualified in Queens County
Commission Expires January 27, 20[...]

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 520-2010-02300 |

**New York State Division Of Human Rights** and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

The retaliation from management included accusations of my having anger issues, based in part on the false allegations of my harassers. Based on these accusations, I was suspended one day without pay, and I was forced to pay for and take anger management classes, which are ongoing. However, no further action was taken against my harassers other than a suspension with pay. Management never addressed my complaints of sexual harassment and instead took the opportunity to retaliate against me.

Based on the above, I believe I have been discriminated and retaliated against in violation of Title VII of the Civil Rights Act of 1964 (as amended), and other Federal, state, and local anti-discrimination statutes.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

Date: 11/4/2010
Charging Party Signature: Robert Dingle Jr.

NOTARY – When necessary for State and local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT: Robert Dingle Jr.

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year): Nov. 4th 2010

CEAYER FEDRICK
Notary Public, State of New York
No. 41-4946347
Qualified in Queens County
Commission Expires January 27, 2011

On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2010-02300 | **Esther Gutierrez,**<br>**Investigator** | **(212) 336-3756** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ]    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]    Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]    Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]    The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]    Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Elizabeth Grossman*                                          3/17/2011

Enclosures(s)                    **Elizabeth  Grossman,**              *(Date Mailed)*
                                 **Acting District Director**

cc:    **David Liebman, Esq.**
       **Associate General Counsel**
       **BIMBOS BAKERIES USA**
       **255  Business Center Drive**
       **Horsham, PA 19044**

Pro Se Office
Pro Se Clerk

Robert Dingle Jr
116-56 219 st
Cambria Hghts. NY 11411

